UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION LEXINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br><br>v.<br><br>DAVID ALLEN EDMONDS,<br>    Defendant. | CRIMINAL NO. 5:23-131-KKC-MAS-1<br><br><br>**OPINION AND ORDER** |

\* \* \* \* \* \* \* \* \*

Defendant David Allen Edmonds moves to suppress a firearm that law enforcement officers found in his car after a warrantless search (DE 17). He argues that a state trooper stopped him while driving without the required probable cause or reasonable suspicion, conducted a dog sniff on the car without reasonable suspicion, and then illegally searched his car without a warrant.

"The government has the burden of proving the legality of a warrantless search." *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007) (citing *United States v. Haynes*, 301 F.3d 669, 677 (6th Cir. 2002)).

I.    Facts

Both parties filed briefs on the issue. In its response brief, the government asserts that Kentucky State Trooper Jack Gabriel stopped Edmonds' vehicle because he was driving without a seat belt on.

The government filed Trooper Gabriel's dashcam and bodycam footage. The dashcam footage begins with Trooper Gabriel's vehicle pulling off from the side of Broadway in Lexington, Kentucky and approaching a stoplight at the intersection with Fifth Street.

Trooper Gabriel testified at the hearing that he was in a Chevrolet Tahoe with state police markings.

It was daylight. A white sedan traveling on Fifth Street crossed Broadway in front of Trooper Gabriel, proceeding from the trooper's right to his left. The first unobstructed view of the sedan appears about six seconds into the video. The sedan's windows are tinted. On the dashcam footage, nothing is visible inside the car. The car is in view for about four seconds before it travels out of the camera's range.

A pickup truck followed behind the sedan on Fifth Street also traveling in front of Trooper Gabriel. Trooper Gabriel testified at the hearing that the truck was driven by a law enforcement officer. After the truck passed, Trooper Gabriel ran the red light on Broadway and turned left on Fifth Street following the path of the truck and the sedan, cutting off another car going through the intersection. Trooper Gabriel testified on cross-examination that the car he cut off was driven by another law enforcement officer who he had warned by radio.

The area of Fifth Street is a residential area. Trooper Gabriel picked up speed on Fifth Street. He passed a sign stating that the speed limit is 25. He appeared to be traveling well above that. He testified at the hearing that he was traveling about 40-45 miles per hour.

The pickup truck traveling behind the sedan pulled over to the side of the road, and Trooper Gabriel passed it. Trooper Gabriel testified on cross examination that the truck was also a law enforcement officer who he had radioed ahead to pull over. At that point, nothing was between the sedan and Trooper Gabriel, who was still speeding down the residential road. As Trooper Gabriel's vehicle approached closer, the sedan veered slightly to the right toward the curb and stopped on Fifth Street at an intersection with another street. Trooper Gabriel stopped behind the sedan.

Trooper Gabriel yelled to the sedan driver to turn the car off. The driver, who was defendant Edmonds, stuck his head slightly out of the driver's side window, looked back at Trooper Gabriel and apparently asked why he was being asked to turn the car off. Trooper Gabriel stated, "because you just whipped over like crazy." He again instructed Edmonds to turn the car off. Edmonds apparently again asked why, and Trooper Gabriel responded, "Because I said so."

About 13 seconds after Trooper Gabriel first instructed Edmonds to turn the car off, Edmonds' brake lights went off. Trooper Gabriel instructed Edmonds multiple times to get out of the car. About eight seconds after Trooper Gabriel first instructed him to, Edmonds got out of the car. Trooper Gabriel instructed Edmonds to walk toward him. Edmonds complied. Another trooper appears on camera at this point walking toward Edmonds' car.

The bodycam footage depicts Trooper Gabriel walking toward Edmonds and asking Edmonds for permission to pat him down or search his person, and the trooper performs the pat down or search. Edmonds asked what was going on, and Trooper Gabriel stated, "Well, I got you with no seat belt and then you freakin' just like dipped over." Trooper Gabriel stated, "I didn't even have my blue lights on yet." Edmonds responded that he saw the truck behind him pull over and so he did the same. Trooper Gabriel's blue lights can be seen flashing on the video footage at this point.

Trooper Gabriel asked Edmonds if anything illegal was in the car. Edmonds responded that there was not. Trooper Gabriel asked Edmonds if he could check the car. Edmonds again asked what he did. Trooper Gabriel stated Edmonds just "whipped over all crazy." Trooper Gabriel told Edmonds, "The fact that you just dipped over like that made me think that something was up. That's the only reason I'm asking if there is anything illegal in the car."

Edmonds stated there was not, and Trooper Gabriel then asked for permission to search the vehicle, which Edmonds denied.

Trooper Gabriel instructed the other trooper to get Edmonds' identification and other information, and Trooper Gabriel walked back to his vehicle and released a German Shepherd from a crate in the back.

Trooper Gabriel and the German Shepherd walked past the white sedan to the curb with the dog leading the way. Trooper Gabriel then led the dog from the curb to the front of the sedan, and then to the driver's side door. The dog, whose name is Dragon, appears to follow Trooper Gabriel's hand. When Trooper Gabriel places his hand in the open driver's side window, the dog jumps onto the driver's side door and sticks his head in the window.

Trooper Gabriel then led Dragon all the way around the vehicle until the trooper and the dog returned to the driver's side door again. At the driver's side door, Trooper Gabriel told Dragon, "I'm not going to give you your ball . . . You're going to have to . . . ." Trooper Gabriel then walked back to the state police vehicle, with Dragon leading the way. Trooper Gabriel returned to Edmonds and explained that Dragon does "a passive alert on a vehicle." Trooper Gabriel stated, "That means he will either sit, or stare, or freeze if he has an indication that there is an odor of narcotics in the vehicle." Trooper Gabriel stated that Dragon is "right on your driver's side door handle."

Edmonds stated, "I didn't see him do nothing. . . what do they do?" Trooper Gabriel responded, "I just told you."

The officers then searched Edmonds' car. They found no narcotics, but they did find a Ruger pistol.

After reading the parties' briefs and viewing the bodycam and dashcam footage, the Court was left with questions it hoped it would be addressed at an evidentiary hearing:

- **Why did Trooper Gabriel stop behind Edmonds' car on Fifth Street?**

Trooper Gabriel indicated in the bodycam footage that he stopped Edmonds for a seat belt violation and also because Edmonds "whipped" or "dipped" over to the side of the road on Fifth Street. The Court viewed the dashcam footage, however, and could not see anything inside of Edmonds' car given the distance between the two vehicles, the sedan's tinted windows, and the angle of the two vehicles. As to his driving, Edmonds' pulling off to the side of the road seemed a rational response for a driver when a marked law enforcement vehicle is approaching the driver's vehicle from the rear at a high rate of speed in a residential area, and the vehicle behind the driver has already pulled to the side of the road so that the law enforcement officer could pass him. And, on the dashcam footage, Edmonds appeared to pull over to the side of the road in a reasonable manner.

In its response brief, the government states, "Though the Defendant's driving pattern was of concern to Trooper Gabriel," Trooper Gabriel stopped Edmonds "based upon Defendant operating a vehicle without a seat belt." (DE 20, Response at 4.) This would indicate that Trooper Gabriel's sole reason for stopping Edmonds was a seat belt violation.

- **If the reason for the stop was only the seat belt violation, why did Trooper Gabriel ask Edmonds so quickly if he had anything illegal in the car? And why did he conduct the dog sniff of the vehicle?**

Nothing on the dashcam or bodycam footage or in the government's response brief indicated that Edmonds was suspected of any violation of drug laws. Trooper Gabriel stated in the bodycam footage that the "only reason" he asked Edmonds if anything illegal was in his car

5

was because Edmonds "dipped over like that." Again, however, Edmonds' driving conduct appeared reasonable on the dashcam footage.

- **Did the dog alert on the driver's side door as Trooper Gabriel stated in the bodycam footage?**

Trooper Gabriel stated in the bodycam footage that the dog would alert by sitting, staring, or freezing. The Court did not see the dog do any of those things in the bodycam or dashcam footage.

## II. Analysis

The Court will begin with the reason for the stop. Trooper Gabriel stated in the bodycam footage and at the hearing that he did not have his blue lights on when he stopped behind Edmonds on Fifth Street. His siren is not heard on the dashcam or bodycam footage, and he testified at the hearing that he never turned his siren on. He also testified that he was not ready to pull Edmonds over when Edmonds stopped his car, but that Edmonds forced him to make the stop by pulling off to the side of the road. Thus, Trooper Gabriel did not "stop" Edmonds in the usual manner by turning on his siren and lights and pulling him over. Instead, the "seizure" began when Trooper Gabriel stopped behind Edmonds and ordered Edmonds to turn the car off and get out of his car.

"The stop of a vehicle qualifies as the 'seizure' of a 'person' that must be 'reasonable' under the Fourth Amendment." *United States v. Brooks*, 987 F.3d 593, 598 (6th Cir. 2021) (citing *Whren v. United States*, 517 U.S. 806, 809–10 (1996)). Officers may stop a driver based on a reasonable suspicion that a felony has occurred or that a misdemeanor is continuing to occur *Id*.; *United States v. Collazo*, 818 F.3d 247, 253–54 (6th Cir. 2016)). The Sixth Circuit has indicated that, if a misdemeanor is completed, officers must have probable cause for an investigatory stop. *Gregory v. Burnett*, 577 F. App'x 512, 516 (6th Cir. 2014) (citing *United*

6

*States v. Simpson*, 520 F.3d 531, 540–41 (6th Cir.2008)). More recently, however, the Sixth Circuit has indicated that, whether officers need reasonable suspicion or probable cause to justify an investigatory stop for completed misdemeanor traffic violations is not settled. *United States v. Hutchins*, No. 22-3655, 2023 WL 7489987, at *3, n. 2 (6th Cir. Nov. 13, 2023), *cert. denied*, 144 S. Ct. 864 (2024).

"Reasonable suspicion" is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Reasonable suspicion is "more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person of criminal activity." *Houston v. Clark Cnty. Sheriff Deputy John Does 1-5*, 174 F.3d 809, 813 (6th Cir. 1999) (internal quotations, ellipsis, and citation omitted). "It requires specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant an investigatory stop." *Id*. (quotations and citation omitted).

As to whether Trooper Gabriel had the required probable cause or reasonable suspicion to stop Edmonds by ordering Edmonds out of his car, Trooper Gabriel's testimony indicated that he had three possible suspicions about Edmonds before the stop.

On direct examination, Trooper Gabriel indicated that he performed the traffic stop because Edmonds "whipped over like crazy" and did not have on his seat belt. This comports with what Trooper Gabriel told Edmonds on the bodycam footage.

On cross examination, however, Trooper Gabriel testified multiple times that he pulled Edmonds over only because of the seat belt violation and that this was the probable cause for the stop. This comports with the government's response brief. Moreover, Trooper Gabriel testified

7

on cross examination that Edmonds' driving did not violate any traffic laws. Instead, he testified, that the way that Edmonds stopped his car raised concerns about "officer safety."

It was not until redirect that Trooper Gabriel revealed another possible reason for the trooper's interest in Edmonds: law enforcement officers were doing surveillance that morning of an area he described as a "high narcotics" area. Trooper Gabriel testified that Edmonds had been observed in the area and that officers had observed Edmonds get in his car and travel down Fifth Street. Trooper Gabriel testified that he was aware of what kind of vehicle Edmonds was driving and that he was waiting on Edmonds at Broadway.

This testimony on redirect explained Trooper Gabriel's previous testimony that two of the vehicles seen on the dashcam footage were law enforcement officers that he was in contact with after he spotted Edmonds. The redirect testimony also provided some context as to why Trooper Gabriel took off after Edmonds from Broadway, ran a red light to pursue him down Fifth Street, and then followed Edmonds at a speed well above the speed limit in the residential area. This appeared to be a reaction to a more serious infraction than a seat belt violation. Finally, Trooper Gabriel's redirect testimony helped explain why he asked Edmonds early in the stop if anything illegal was in his car and why the trooper conducted a dog sniff of the car.

However, in determining whether a traffic stop is reasonable, the subjective motivation of the law enforcement officer is irrelevant. The issue is whether the stop is objectively reasonable. Thus, a traffic-violation arrest is not rendered invalid even if it was a pretext for a narcotics search. *Whren v. United States*, 517 U.S. 806, 810 (1996) (quoting *United States v. Robins*on, 414 U.S. 218, 221, n.1 (1973). *See United States v. Herbin*, 343 F.3d 807, 810 (6th Cir. 2003) ("From beginning to end, the constitutionality of a traffic stop under the Fourth Amendment depends on the objectively reasonable justifications for the officers' actions, not their subjective

intentions.") *United States v. Johnson*, 242 F.3d 707, 709 (6th Cir. 2001) ("[W]hether a traffic stop is reasonable does not depend upon the motivation of the officers.").

Of the three possible suspicions that Trooper Gabriel's testimony revealed about Edmonds, the only one that could possibly be an objectively good reason for the traffic stop is the seat belt violation. Edmonds' pulling over to the side of the road does not provide a justification for the stop. The dashcam footage depicts Edmonds pulling over in a reasonable manner, and Trooper Gabriel testified that Edmonds did not drive in any way that violated any traffic law.

Nor does Trooper Gabriel's testimony that Edmonds had been seen in a high narcotics area, by itself, justify stopping him. "[A]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *United States v. See*, 574 F.3d 309, 314 (6th Cir. 2009) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Trooper Gabriel conceded that he did not have reasonable suspicion that Edmonds was involved in any criminal activity other than a traffic violation until Dragon alerted on the driver's side door.

That leaves the seat belt violation. The Court is unable to see anything through the windows of the sedan in the dash cam footage when Trooper Gabriel is on Broadway. Trooper Gabriel testified, however, that the video does not accurately depict what he was able to see. He testified that Edmonds was wearing a white T-shirt, which enabled him to see through the window tinting that Edmonds did not have a seat belt going across his chest. This testimony does not adequately refute what the Court was able to see in the video. There is a significant distance between the vehicles, the driver's side window is tinted, the sedan was in Trooper Gabriel's view for seconds before Trooper Gabriel ran the red light to pursue it, and, in that time, Trooper

9

Gabriel could see only the left side of the driver; he could not see into the front of the sedan. As to whether Trooper Gabriel could see anything after he began following Edmonds, Trooper Gabriel testified that he could see nothing through the rear window because of the tinting.

In support of its argument that Trooper Gabriel could see Edmonds through the driver's side window, the government submits a still photograph of the interior of Edmonds' car on the date that Trooper Gabriel pulled him over. Trooper Gabriel testified that the photograph depicts a device placed in Edmonds' seat belt that stopped the car from making a warning sound when Edmonds failed to buckle his seat belt but also prohibited him from buckling the seatbelt. The government also submits the bodycam footage of another law enforcement taken on a different date. The government asserts that the vehicle in the footage is Edmonds' car. In the bodycam footage, the officer states that Edmonds does not like to wear seat belts, and she describes to another officer the seat belt device in the car. While the photograph and video might be evidence that Edmonds was not wearing a seat belt the day that Trooper Gabriel stopped him, it does not help establish what Trooper Gabriel saw before he took off after Edmonds. Trooper Gabriel did not testify that he could see the seat belt device in the car before he actually entered the car to search it.

Without a better explanation of how Trooper Gabriel was able to see that Edmonds was not wearing a seat belt on the day that the trooper stopped Edmonds for that violation, the Court cannot find that Trooper Gabriel had reasonable suspicion to stop Edmonds for failing to wear a seat belt.

But even if the Court were to find that the government had established the constitutionality of the traffic stop, the Court could not find that the government established the constitutionality of the warrantless search of Edmonds' car.

10

The dog sniff that led to the search was likely constitutional because it did not prolong the stop (assuming, of course, that the stop was constitutional). The dog sniff is constitutional if either 1) Trooper Gabriel had reasonable suspicion that Edmonds was engaged in criminal activity that would justify a dog sniff or 2) the dog sniff did not add time to the stop. *Rodriguez v. United States*, 575 U.S. 348, 355 (2015); *Klaver v. Hamilton Cnty., Tennessee*, No. 22-5083, 2022 WL 16647970, at *3 (6th Cir. Nov. 3, 2022), *cert. denied sub nom. Wilkey v. Kla*ver, 143 S. Ct. 1004 (2023); *United States v. Guidry*, 817 F.3d 997, 1005 (7th Cir. 2016) ("Under *Rodriguez*, Guidry's claim fails for two reasons: first, the dog sniff did not prolong the traffic stop, and second, even if it had, the officers had reasonable suspicion to believe that Guidry's car contained illegal drugs.")

There is no dispute that Trooper Gabriel did not have reasonable suspicion that Edmonds' car contained illegal drugs or was otherwise involved in illegal activity. The government has not argued that he did. Trooper Gabriel testified that he did not have a reasonable suspicion that Edmonds was involved in criminal activity other than a seat belt violation until Dragon alerted on the driver's side door. The information that Trooper Gabriel revealed during the redirect – that Edmonds had been in a "high narcotics area" – does not, by itself, provide reasonable suspicion that he was involved in that activity.

The dog sniff was likely permissible, however, because it did not prolong the traffic stop. This was an odd traffic stop. Trooper Gabriel conceded he did not follow his typical procedure for a traffic stop. He testified that, typically, he would turn on his blue lights at a safe location for the stop. After the vehicle pulls over, he typically approaches the passenger side for safety and, through the passenger side window, asks for the driver's license, registration, and proof of insurance.

Trooper Gabriel testified that he did not turn on his blue lights before Edmonds pulled over on Fifth Street because he did not want to alert Edmonds that the officers were behind him and "provoke a potential vehicle pursuit." He also testified, however, that he was not yet ready to stop Edmonds when Edmonds stopped his car.

Trooper Gabriel testified that, when Edmonds pulled over, that forced Trooper Gabriel to make the traffic stop before he was ready to do it. Trooper Gabriel testified that he did not approach Edmonds' car like he usually would on a traffic stop because of Edmonds' "driving conduct" when Trooper Gabriel was behind him; because Edmond looked out of the driver's side window and back at Trooper Gabriel after he stopped, which Trooper Gabriel described as "blading"; and because Trooper Gabriel had to ask multiple times for Edmonds to turn the car off and get out of the car before Edmonds complied. For these reasons, instead of approaching Edmonds' car, Trooper Gabriel yelled at Edmonds to stop the car and get out.

This is permissible if the traffic stop was lawful. "[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977). Edmonds does not assert that it was unconstitutional for Trooper Gabriel to order him out of the car.

Edmonds does not dispute that he consented to the pat down or search of his person. Soon after that, Trooper Gabriel instructed the other trooper to get Edmonds' identification, and Trooper Gabriel walked back to his vehicle to get Dragon. The dog sniff took less than 90 seconds. Thus, if Trooper Gabriel constitutionally stopped Edmonds, the Court cannot find that he unreasonably prolonged the stop with the dog sniff.

That leaves the question as to whether Dragon alerted on the driver's side door as the government asserts. "It is blackletter law that the police can lawfully search a car without a warrant if they have probable cause." *Hernandez v. Boles*, 949 F.3d 251, 259 (6th Cir. 2020). "An alert to the presence of drugs by a properly trained narcotics detection dog is sufficient to establish probable cause to search a vehicle." *United States v. Sharp*, 689 F.3d 616, 618 (6th Cir. 2012).

In the bodycam footage, Trooper Gabriel told Edmonds that Dragon gave a passive alert to the presence of narcotics in the car, and he explained that meant Dragon would "either sit, or stare, or freeze if he has an indication that there is an odor of narcotics in the vehicle." Trooper Gabriel told Edmonds that Dragon alerted "right on your driver's side door handle." In the dashcam footage, however, Dragon does not sit, stare, or freeze at the driver's side door of the car.

At the hearing, Trooper Gabriel conceded that Dragon did not sit, stare, or freeze while sniffing Edmonds' car. He testified, however, that is not actually how Dragon alerts. Instead, Trooper Gabriel testified, the dog alerts by changing his posture and increasing his respiration. He testified the dog's actions of sitting, staring, or freezing are not an "alert" but rather a "final indication."

Trooper Gabriel testified that Dragon alerted at the driver's side door when the dog stopped walking and looked at Trooper Gabriel, his respirations increased, he no longer tried to walk past Trooper Gabriel, and he increased his sniffs up and down the door seam. Trooper Gabriel testified that Dragon did not ever provide a final indication.

The Court has viewed the dashcam and bodycam footage numerous times. The Court can discern no difference in the dog's posture or respiration when he arrives at the driver's side of

the car for the second time, which is when he allegedly alerted. There is no visible change in his rate of respiration. Throughout the sniff of the car, Dragon followed Trooper Gabriel's hand. He does not ever attempt to walk past Trooper Gabriel. When Trooper Gabriel moves, Dragon follows. When Trooper Gabriel stops, Dragon stops. This is Dragon's conduct throughout the dog sniff. The only time Dragon walked ahead of Trooper Gabriel was when Dragon walked to the curb after first being released from his crate and then after Dragon completed the drug sniff and headed back to the state trooper vehicle.

Without a better explanation of how Dragon alerted on the driver's side door of Edmonds' car, the Court cannot find that the government has met its burden of showing that Trooper Gabriel had probable cause to search Edmonds' car without a warrant.

### III. Conclusion

For these reasons, the Court hereby ORDERS that Edmonds' motion to suppress (DE 17) is GRANTED and the government is prohibited from using the firearm found in Edmonds' car as evidence in this action.

This 24th day of April, 2024.

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY